732 So.2d 589 (1999)
Robert M. BECNEL
v.
Kathleen F. BECNEL.
No. 98-CA-593.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 1999.
Writ Denied June 4, 1999.
*590 Brenda Braud Birner, William B. Birner, Birner & Birner, Laplace, Louisiana, Counsel for plaintiff-appellant.
Robert C. Lowe, Ellen Widen Kessler, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, Louisiana, Counsel for defendant-appellee.
Court composed of Judges H. CHARLES GAUDIN, CHARLES GRISBAUM, Jr., JAMES L. CANNELLA, THOMAS C. WICKER, Jr., Pro Tempore, and NESTOR L. CURRAULT, Jr., Pro Tempore
THOMAS C. WICKER, Jr., Judge Pro Tempore.
This is a dispute between parents of a minor child over the father's visitation rights. The parties are Robert Becnel and his former wife, Kathleen Finney Becnel, who were divorced in 1995. Robert and Kathleen had been married for 20 years and had four children (Bridgette, Kelly, Meghan and Ryan). At the time the judgment on appeal was rendered, Bridgette and Kelly were majors, Meghan was age 17, and Ryan was age 11. At issue before us is the trial court's denial of Robert's motion for modification of visitation restrictions.
*591 The record indicates the divorce and its incidental matters have been bitterly contested. At the time of the divorce Robert was in a relationship with Diane Zink, to whom he is now married. In August 1996 the trial court rendered a judgment which made various provisions for custody, support and visitation of the children, based on stipulations and agreements of the parties. It granted the parties joint custody of Meghan and Ryan, with Kathleen as the domiciliary parent. The judgment provided for visitation and specified that Meghan and Ryan "are not to be exposed to, or be in the company of Dian [sic] Zink under any circumstances." The judgment stated this prohibition would be re-examined after Easter 1997 and "the rights of all parties to it are reserved to them."
In March 1997 Robert filed a rule for contempt, alleging that Kathleen had failed or refused to allow Ryan to visit with him. Kathleen, in response, sought an ex parte order denying Robert all visitation rights. In May 1997 the court ordered the parties to submit to psychiatric evaluation and therapy, at Robert's expense. Kathleen did not comply with the court-ordered evaluation or therapy.
In September 1997, Robert filed a rule requesting that the visitation restrictions be vacated, that certain holiday visitation provisions be modified, and that the children be allowed to attend his wedding to Diane, which was scheduled for February 28, 1998. That rule was heard on January 7, 1998.
Kathleen opposed any change in the visitation restrictions and filed an exception of no cause of action on the ground there had been no change of circumstances to warrant adjustment of visitation. She further asserted that removal of the restriction would be "an infringement on the Becnel children's freedom of religion and freedom to practice the religion into which they were born." Specifically, Kathleen is a member of the Roman Catholic faith who believes, and has taught her children to believe, that Catholics who have been married in the Catholic rite who later divorce, then remarry without obtaining an annulment within the Catholic church, commit adultery.
Kathleen contended that Robert's marriage to Diane is "nothing less than adultery in religious terms, because his marriage vows have not been declared invalid by any ecclesiastic authority. His violation of those vows, according to Catholic teaching, is a mortal sin." Further, Kathleen argued that Robert could not make a showing that what he proposed is in the best interest of the children.
The trial court interviewed both children in chambers at the hearing, with only the attorneys present. The judge found that both children knew and believed in the Catholic teachings regarding remarriage by divorced Catholics; that the older child, Meghan, is mature and categorically stated she did not want to go to the wedding; that the younger child, Ryan, whom the judge described as "sensitive and articulate," became visibly emotional and close to tears in discussing the issues.
The trial court rendered judgment on March 9, 1998, granting the exception of no cause of action regarding change in the requested holiday visitation. As to Meghan, the court vacated the visitation prohibition, conditioned upon Meghan's desire and concurrence to being in Diane's presence and leaving such visitation at Meghan's discretion. As to Ryan, the court denied the rules and maintained the prohibitions, stating:
The court bases this finding not on a weighing of Ryan's constitutional right to freedom of religion against his father's visitation rights, but rather a finding that it would not be in the best interest of this child at this time to impose his attendance at a wedding, his presence at which he believes would constitute a mortal sin. Based on his present circumstance and his emotional frame of mind, such a mandate would be cruel.
*592 In addition, the court noted that Robert had failed to "allege or suggest a predicate change of circumstances which might trigger a valid request for modification."
Robert appeals. The portion of the ruling regarding Ryan's attendance at the wedding is now moot. The only issue on appeal is whether the court erred by maintaining the restriction which prohibits the presence of Robert's wife, Diane, during Robert's visitation with Ryan.
Robert argues the court erred in not balancing his right to unrestricted visitation against any possible infringement upon the children's first amendment right of religion. He asserts that although the court referred to Ryan's best interest in refusing to order that Ryan attend Robert's wedding, the court gave no specific reason for denying the rule to change the visitation prohibition. Accordingly, he contends the record does not rebut the presumption that it is in the best interest of minor children that visitation with the non-domiciliary parent be as unrestricted as possible. He asserts there is nothing in the record to support maintaining the restriction that visitation be only outside the presence of Diane, because she is now married to Robert and there is no evidence her presence is harmful to the children, nor any proof that being in her presence has had adverse effects on the two major daughters, Bridgette and Kelly.
Kathleen contends that the trial court acted correctly in maintaining Robert's existing visitation, which is reasonable and consistent with Ryan's best interest, and that the court correctly protected Ryan's best interest in maintaining the existing visitation agreement, properly giving more weight to Ryan's best interest than to Robert's personal wishes. She asserts the determination of the trial judge, who heard the evidence and saw the witnesses, is entitled to deference, especially since the judge found that forcing the visitation the father demanded would be cruel for the child. Further, she contends the court correctly protected the child's best interest rather than the father's desire that the child get to know his new wife. Finally, she argues that the father already has extensive visitation with Ryan and cannot disregard the boy's sincere religious beliefs to force the child into situations which conflict with those beliefs and upset the child for the father's convenience.
"A parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child." La. Civ.Code Art. 136(A). The law recognizes the non-custodial parent's entitlement to reasonable visitation unless it is shown it would seriously endanger the child's mental, moral or emotional health. Maxwell v. LeBlanc, 434 So.2d 375, 377 (La.1983). The rights of any parent, however, are always subservient to the best interests of the child. Maxwell v. Le-Blanc, 434 So.2d at 377.
The Maxwell court emphasized the trial judge should be guided by several factors in deciding whether to deny or limit visitation: the emotional ties between the parties and the child; the parties' capacity and disposition to give the child love, affection and guidance and to continue educating and raising the child; the capacity and disposition of the parties involved to provide the child with material needs; the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity; the moral fitness of the parties involved; the reasonable preference of the child; the willingness and ability of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the parent; the effect of visitation upon physical condition of child. Id. at 378-379.
The question of visitation is always open to change when the conditions warrant it. Reynier v. Reynier, 545 So.2d 663, 664 (La.App. 5th Cir.1989). Where there have been restrictions placed on a *593 noncustodial parent's visitation rights, those restrictions should be lifted when it is shown to be in the child's best interest. Id.
As noted above, the August 30, 1996 judgment was a consent judgment. It specified not only that Ryan was "not to be exposed to, or be in the company of Dian [sic] Zink under any circumstances," but also "[t]his prohibition will be re-examined after Easter, 1997, and the rights of all parties to it are reserved to them." (Emphasis added.)
That reservation of rights placed this visitation restriction outside the usual range of visitation determinations, even visitation arrangements made by consent judgments. Nevertheless, the trial judge treated the judgment as he would have treated a normal stipulated judgment without a reservation of rights.
The reasons for judgment concentrated on the effect on Ryan of attending his father's wedding to Ms. Zink. The court did not discuss specifically the effect on Ryan of regular visitation with his father when Ms. Zink (now his stepmother) is present. The court concluded that Ryan's mother "has, for a considerable period, been instructing Ryan as an article of faith that he was ... `in the occasion of sin' if he found himself in the company of his father and Ms. Zink and later he would be committing a mortal sin if he attended their wedding, thereby placing a terrifying burden on the child."
The court's denial of the rule to modify the visitation restriction was couched only in terms of Ryan's attendance at his father's wedding. The court failed to make a "best interest" finding regarding future visitation with his father in the presence of his new stepmother. We find the omission of a specific best-interest finding with regard to modifying the visitation restriction was a legal error which nullifies the fact-finding process.
[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence.... A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial.... Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.... When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. [Citations omitted.]
Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735.
Our review of the record and the testimony persuades us that the animosity of the child's mother toward his father probably has influenced the child's attitude far more than his religious convictions.
First, in a prior hearing the trial judge (a different ad hoc judge than the one who made the ruling now on appeal) found, "I conclude that unfortunately Mrs. Becnel appears to be totally obsessed with ... the separation, the divorce, and the impending remarriage of Mr. Becnel." That judge further found that certain factual claims by Kathleen Becnel regarding Robert Becnel's behavior and actions toward her were untrue and noted it "would have been very, very easy" for him to have sent Kathleen directly to the jail for contempt.
Further, Kathleen admitted that she has never complied with a prior court directive that she undergo psychiatric evaluation and counseling.
In addition, there is testimony casting doubt on Kathleen's claims to be guided by sincere religious belief. She admitted, for example, that her housekeeper "lives in sin" with a man and that the children are *594 occasionally in the presence of the house-keeper, but she distinguished that situation on the ground that the Becnel children "don't sleep at her house" and are not exposed to the housekeeper's relationships. She admitted that her children have been in the presence of Catholics who have been married and divorced and then remarried, although she does not allow them to spend the night at homes where she knows the parents are "living in sin." She also admitted that, contrary to the stricture of the Catholic religion against use of birth control, she took birth control pills during her marriage to Robert. (She stated she decided to take the pills after a discussion with her pastor and that she believed she was not violating her religion.)
Although Kathleen stated she believes that divorced Catholics who remarry outside the Church are committing adultery and "living in sin," she does not object to Ryan's visitation with his father, only to visitation while Diane is present. Kathleen could not say, however, that Ryan's faith would be in jeopardy if he were in the joint presence of his father and stepmother after their marriage. Nor could she point to any danger associated with Diane Zink as a person.
Kathleen's logic is flawed. If the children cannot be in the presence of Diane because she is married to a Catholic who does not have an ecclesiastic annulment, the logical conclusion is that the children also should not be in the company of their father.
Further, one of Ryan's sisters testified that Kathleen had told the children that if they refused to visit with their father or to be in the presence of Diane, he might return home and to his marriage to Kathleen.
Father Robert Vincent, Kathleen's expert witness on Roman Catholic doctrine, testified that both Robert and Diane would be considered sinners by the Catholic Church due to their marrying without a Catholic annulment of Robert's first marriage. However, Father Vincent said it is not against Roman Catholic doctrine for the Becnel children to be in the presence of Robert or Diane unless their lifestyle influences the children to lose their faith.
Robert Becnel testified that his children have been in the presence of divorced and remarried Catholics many times and that it has not affected their religious upbringing and training. (For example, he stated, the counselor and the headmaster at Meghan's school both are divorced and remarried Catholics.) He also stated that Ryan has questioned him on occasion regarding the divorce/remarriage issue, indicating his mother told him to do so.
Kathleen Becnel has admitted she knows of nothing regarding Diane Zink as a person that would make her unsuitable to be in Ryan's presence. There is no evidence that her presence is harmful to the children, nor any proof that being in her presence has had adverse effects on the two major daughters, Bridgette and Kelly. Kathleen's opposition to Diane's presence during Ryan's visits allegedly is based solely on religious doctrine.
We find the record fails to establish that it would not be in Ryan's best interest to have unrestricted visitation with his father. "[A] father is just as important to the well-being of a child as is a mother, regardless of the child's age." Dearmon v. Dearmon, 96-222 (La.App. 3rd Cir. 11/13/96), 682 So.2d 1006, 1009.
Under the current restriction, Robert Becnel's wife must leave her home every weekend or other occasion that Ryan spends with his father. Alternatively, Robert must take Ryan somewhere else to visit with him. Robert can neither celebrate holidays nor take vacations in company with both his wife and Ryan. Requiring visitation be maintained with this restriction deprives Ryan of the opportunity to see his father in a healthy and happy environment with his present wife and deprives his father and stepmother of the chance to know and associate with Ryan freely.
*595 It is a reality of modern life that Ryan can expect, in the course of his lifetime, to associate with and be in the presence of, or even be related to, many Roman Catholics who have divorced and remarried outside the church rite. It is a realistic necessity that he learn to deal with other people whose religious or moral code may not be the same as his.
The parent who drifts away from his children because of a divorce or separation may be able to improve his damaged relationship with his offspring later in life, but he and they will never be able to re-create their lost time together. For this reason, the fit, noncustodial parent who wants to remain an active force in his children's lives should be given the utmost encouragement by the courts. Curtailing his visitation, or dictating the character of it, in order to further the religious wishes of a custodial parent is not in harmony with this goal[.]
* * *
[C]ourts that treat the visitation and constitutional rights of parents cavalierly or casually serve neither the parties before them nor the cause of justice.
Higginbotham, "Mom, Do I Have to Go to Church?": The Noncustodial Parent's Obligation to Carry Out the Custodial Parent's Religious Plans, 31 Fam.L.Q. 585, 596 (1997).
Given the weighty matters at stake, it was insufficient for the trial court to base the ruling on the judge's own personal interview with Ryan. We hold the restriction on the child's visitation with his father should not be maintained absent clear evidence that lifting it would be harmful. Accordingly, we vacate the ruling which restricts the visitation of Ryan Becnel with his father, Robert Becnel, in the presence of Diane Zink.
For the foregoing reasons, the judgment on appeal is vacated insofar as it maintained the restriction on Ryan's visitation with his father in the presence of Diane Zink and the motion of Robert Becnel for modification is granted. Costs of appeal are assessed against Kathleen Becnel.
VACATED, MOTION GRANTED.
GAUDIN, J., CONCURS.
CURRAULT, J., DISSENTS WITH REASONS.
GAUDIN, J., CONCURS with the result reached by and in the foregoing opinion but not necessarily with all of the wording.
CURRAULT, Judge, DISSENTS WITH REASONS.
I respectfully dissent from the majority opinion reversing the judgment of the trial court in the present matter. In my opinion, there is no basis in the record for finding either an error of law or an abuse of discretion.
The reasons for judgment specifically refer to denial of "the rules" (plural), which were filed to vacate the general restriction relative to Diane Zink as well as to have the children participate in wedding activities. The rules were tried together at the same time. Although the reasons for judgment do not make a "best interest" determination separately in regard to the visitation restriction, it is clear that for the same reasons he would not order attendance at the wedding itself, the trial judge found that a change in the visitation restriction was not in Ryan's best interest. Consequently, in my opinion, the finding by the majority that a best interest determination was not made regarding visitation is a hyper technical interpretation of the judgment and is not supported by the record on appeal. I must conclude that the finding of the trial court relative to the best interest of Ryan applies to both rules, and therefore there was no error of law in that regard. Accordingly, I find no basis for a de novo review by this court, and believe we are *596 therefore limited to a review of this judgment for abuse of discretion.
In my opinion, the record discloses no such abuse. It is most important to consider that the trial court had the benefit of an examination of the children in chambers, before counsel for both parties but outside the presence of a court reporter. The parties could not agree on a narrative of facts; as a result, the court issued its own narrative. There the judge stated that Ryan did not want to go to the wedding and did not want to spend time with his father afterwards. In its reasons for judgment, the court found it would be cruel to force him to do so. This court is not privy to that examination and therefore, there is no basis of record upon which we may find that the court abused its discretion, or that it would not be cruel to force the child to spend time with his father after the wedding.
I wholeheartedly agree that Ryan ought to spend as much time with his father as is reasonable, and that his father is as important as his mother. As the majority noted, the right of visitation is not without its limitations. The rights of any parent are always subservient to the best interests of the child. Maxwell v. LeBlanc, 434 So.2d 375 (La.1983); Percle v. Noll, 93 1272 (La. App. 1 Cir. 3/11/94), 634 So.2d 498; Finnerty v. Boyett, 469 So.2d 287 (La.App. 2 Cir.1985); Muller v. Muller, 94-281 (La. App. 3 Cir. 10/5/94), 643 So.2d 478.
I am aware of the jurisprudence which holds that a child's preference, although not dispositive, is an appropriate factor to consider in determining the best interest of the child. See e.g. Connelly v. Connelly, 94-0527 (La.App. 1 Cir. 10/7/94), 644 So.2d 789. That desire, however, is a factor which may and should be considered, along with all of the other circumstances, in making that determination. Hebert v. Hebert, 255 So.2d 630 (La.App. 3 Cir.1971). In setting visitation, each case must be judged on its own facts and circumstances. See Hawthorne v. Hawthorne, 96-89 (La. App. 3 Cir. 5/22/96), 676 So.2d 619. In Maxwell, supra, the court noted the case of Litton v. Litton, 299 So.2d 458, (La.App. 2 Cir.1974). There, the trial court limited visitation of a 13 year old child with her father in his new home, in large part because she was emotionally upset at her father's remarriage; the child preferred to visit with him at her home. (I recognize that visitation with Ryan at the home he shares with his mother is probably unfeasible in this case.)
Although Mr. Becnel urges that the trial court made its determination based on religious issues, a reading of the record, the judgment, and the reasons for judgment does not support this contention. The trial court specifically stated that it did not base its judgment on such issues. Rather, the court found that Ryan is "a sensitive and articulate child" who "stated that he knows the ramifications of remarriage by his father. At the conclusion, the child became visibly emotional and close to tears." Ryan's deeply emotional response as recorded by the trial court indicates that forcing him to be in the presence of his father and (future)stepmother would, in the words of the trial judge, be cruel based on his present circumstances and frame of mind and obviously therefore not in his best interest. Because of his religious upbringing, he is emotionally distraught over the marriage and it is his emotional state, not that of Mr. Becnel or his bride, which determines the issue of "best interest." It is evident that the trial court believed that a change of visitation at the time the hearing took place, which would have included contact with Mr. Becnel's bride, would have been deleterious to the emotional well-being of Ryan. It cannot be overemphasized that this court does not have the benefit of a transcript of the children's testimony. Under these circumstances, the appellate court must presume that the judgment of the trial court is correct and supported by sufficient competent evidence. See Preuett v. Preuett, 517 So.2d 848 (La.App. 3 Cir.1987). Testimony taken at the trial is presumed to support the *597 trial judge's conclusion. Saacks v. Saacks, 96-736 (La.App. 5 Cir. 1/28/97), 688 So.2d 673.
The instant case involves a situation in which a decision by a parent to remarry has resulted in intense distress to a child. The custody agreement with its original restriction evidences that Mr. Becnel was well aware, prior to his marriage, of the effect of his relationship with Ms. Zink on his children. While Mr. Becnel and Ms. Zink certainly had every right to marry, appellant must now accept the (unintended) consequences as it affects his son. Certainly in many, if not most cases, the remarriage of a divorced parent would not affect a child to the same degree as it has Ryan, and therefore such restrictions as the one in the present matter would not be appropriate. It is clear that Mr. Becnel loves his son and wishes to maintain a close relationship with him. While the new family unit may in time become a source of comfort to Ryan, it is evident that such was not the case at the time of the judgment.
Finally, I note the disparate treatment which is a result of reversing the present judgment. Meghan, who expressed her feelings and preferences to the trial court, will be allowed to visit or not as she sees fit. Ryan will be obliged to perform an act which he finds not only not to his choosing, but which is extremely distressing to him. He is not so young so as to discount his expressed and articulate feelings.
Because visitation remains subject to modification, affirmation of the present judgment does not preclude a court ordered reevaluation of all parties and/or counseling, and I note that appellant may always re-urge his motion in the future under the proper circumstances.
For all these reasons, I would affirm.